PUBLISH                                    **August 27, 2018**

UNITED STATES COURT OF APPEALS Elisabeth A. Shumaker
Clerk of Court

**TENST CIRCUIT**

_____

FRANK HALLEY, as next friend of
J.H., a minor child,

      Plaintiff - Appellee,

v.                                         No. 16-7079

SARA HUCKABY, in her individual
capacity,

      Defendant - Appellant.

and

STATE OF OKLAHOMA EX REL.
THE OKLAHOMA STATE
DEPARTMENT OF HUMAN
SERVICES; KEN GOLDEN, in his
official capacity as Sheriff of Bryan
County, Oklahoma; NATHAN
CALLOWAY, in this individual
capacity; JEFF GOERKE, in his
individual capacity; BRYAN
COUNTY SCHOOL DISTRICT 4,
sued as Independent School District
No. 4 of Bryan County, also known as
Colbert School District,

      Defendants.

----------------------------------------------

FRANK HALLEY, as next friend of
J.H., a minor child,

      Plaintiff - Appellee,

v.                                         No. 16-7080

JEFF GOERKE, in his individual capacity,

        Defendant - Appellant.

and

SARA HUCKABY, in her individual capacity; STATE OF OKLAHOMA EX REL. THE OKLAHOMA STATE DEPARTMENT OF HUMAN SERVICES; KEN GOLDEN, in his official capacity as Sheriff of Bryan County, Oklahoma; NATHAN CALLOWAY, in his individual capacity; BRYAN COUNTY SCHOOL DISTRICT 4, sued as Independent School District No. 4 of Bryan County, also known as Colbert School District,

        Defendants.

-----------------------------------------------

FRANK HALLEY, as next friend of J.H., a minor child,

        Plaintiff - Appellee,

v.

NATHAN CALLOWAY, in his individual capacity,

        Defendant - Appellant.

and

No. 16-7081

SARA HUCKABY, in her individual capacity; STATE OF OKLAHOMA EX REL. THE OKLAHOMA STATE DEPARTMENT OF HUMAN SERVICES; KEN GOLDEN, in his official capacity as Sheriff of Bryan County, Oklahoma; JEFF GOERKE, in his individual capacity; BRYAN COUNTY SCHOOL DISTRICT 4, sued as Independent School District No. 4 of Bryan County, also known as Colbert School District,

Defendants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. CIV-0562-JHP)**

---

Emily B. Fagan (John K.F. Langford with her on the briefs), Assistant General Counsel, Oklahoma State Department of Human Services, Oklahoma City, Oklahoma, for Appellant Sara Huckaby.

Clark W. Crapster (Mark E. Fileds with him on the briefs), Steidley & Neal, P.L.L.C., McAlester, Oklahoma, for Appellant Jeff Goerke.

Wellon B. Poe (Chris J. Collins with him on the briefs), Collins, Zorn & Wagner, P.C., Oklahoma City, Oklahoma, for Appellant Nathan Calloway.

J. Spencer Bryan (Steven J. Terrill with him on the brief), Bryan & Terrill Law, PLLC, Tulsa, Oklahoma, for Appellee Frank Halley.

---

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **LUCERO**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

J.H. is a minor child represented by his grandfather Frank Halley. J.H. claims a child welfare specialist at the Oklahoma Department of Human Services and two police officers wrongfully seized and questioned him about possible abuse by his father. Because of this conduct, J.H. argues these officials violated the Fourth Amendment, and that two of the three officials violated the Fourteenth Amendment by unduly interfering with J.H's substantive due process right of familial association.

The officials moved for summary judgment—arguing, in part, that qualified immunity shielded them from liability. The district court denied qualified immunity, and this interlocutory appeal followed.

We affirm in part and reverse in part. The district court correctly determined that two of the three defendants were not entitled to qualified immunity on the Fourth Amendment unlawful seizure claim. But we reverse the district court's denial of qualified immunity for the officer who merely followed orders by transporting J.H. We also reverse the district court's denial of qualified immunity on the Fourteenth Amendment interference with familial association claim since it was not clearly established that the officials' conduct violated the Fourteenth Amendment.

# I. Background

The Oklahoma Department of Human Services (DHS) received an anonymous call voicing a concern for the safety of six-year-old J.H., alleging J.H.'s father used drugs and had a prior arrest record for possessing drugs and a firearm.[1] DHS classified the call as a "Priority Two," which is a low-priority classification that gives DHS several days to respond.

The morning after the anonymous call, February 13, 2014, Deputy Nathan Calloway, a defendant here, met with two DHS employees to discuss how to respond to the call. Calloway, a deputy with the Bryan County Sheriff's Department, already knew of allegations that J.H.'s father abused drugs. Deputy Calloway had learned this information when he interviewed the father's ex-wife on January 23, 2014. Deputy Calloway also knew of pending charges against the father's ex-wife for filing a false report of domestic abuse and that J.H.'s father had been acquitted once before of domestic abuse charges.

---

[1] The district court noted the original Referral Information Report only indicated that J.H.'s safety might be implicated because his father "was a methamphetamine abuser who had been arrested in January 2014 for possession of meth, meth paraphernalia, and a firearm." Aplt. App. 702 n.2. According to the district court, the original report did not mention anything about possible combative behavior between J.H.'s father and his ex-wife in the presence of the child. And the district court doubted the authenticity of a subsequent supplemental report containing such information because it was inconsistent with the first report. None of the defendants dispute the district court's conclusion about the conflicting nature of the reports.

At the meeting, Deputy Calloway agreed that J.H. should be taken into protective custody and interviewed, or at least acquiesced to the proposal. It is unclear from the summary judgment record whose idea it was to interview J.H. DHS investigator Kari Reed testified it was Deputy Calloway's idea, but Deputy Calloway disputes that assertion. In any event, according to the plan, Deputy Calloway would pick up J.H. from school on the following day, February 14, and drive him to a DHS safe-house for an interview. Once J.H. arrived, DHS personnel would ask him structured questions in a forensic interview to determine whether he was being abused.

The next day, Deputy Calloway told Reed that he would not be able to pick up J.H. from school. As Reed was leaving the office, Sara Huckaby, DHS child welfare specialist and defendant in this case, asked whether she could help. Reed asked Huckaby to arrange for J.H. to be picked up for the interview. Huckaby then called Chief of Police Jeff Goerke, the third defendant here, and asked him to pick up J.H. There is a dispute in the record as to what Huckaby told Goerke. Goerke testified that Huckaby told him there was a verbal court order authorizing the seizure, but Huckaby disputes that fact.

Whatever the case may be, Goerke transported J.H. to the safe-house. J.H. told Goerke he did not want to leave school, but Goerke took him away from school and to the safe-house anyway. The safe-house was about thirteen miles away, and the ride took about fifteen minutes. On the way there, Goerke

apparently told him he would be given "a better home, a safer home where there is no violence." Aplt. App. 603–604; Aple. Br. at 5.

Deputy Calloway arrived at the safe-house before the interview and helped set up the video-recording equipment. Huckaby conducted the forty-minute interview—exploring J.H.'s family life and relationship with his father. At the conclusion of the interview, Deputy Calloway transported J.H. back to school.

The interview did not yield any evidence of abuse. Left with only the uncorroborated and anonymous tip, DHS did not proceed any further.

Yet the interview did have consequences. J.H. purportedly suffered stress and trauma as a result of the questioning. J.H.'s relationship with his father apparently suffered too, as J.H. has allegedly come to resent him—believing that he was responsible for the trauma J.H. suffered from the interview.

J.H. then brought this 42 U.S.C. § 1983 lawsuit. Among other claims, J.H. has alleged Huckaby, Deputy Calloway, and Chief Goerke violated J.H.'s Fourth Amendment right to be free from unreasonable seizures. He further claimed they conducted this unjustified interview with the intention of interfering with J.H.'s relationship with his father. They did this, J.H. claims, in retaliation for not having been able to convict J.H.'s father of the domestic abuse allegations that his father's ex-wife had made.

The district court denied Huckaby's, Calloway's, and Goerke's motions for summary judgment on the basis of qualified immunity, and they appealed.

## II. Analysis

The defendants contend the district court erred in denying their motions for summary judgment. All three defendants argue they are entitled to qualified immunity on J.H.'s Fourth Amendment claims, and Huckaby and Deputy Calloway argue the same for J.H.'s Fourteenth Amendment claims against them.

### A. *Standard of Review*

We review the district court's denial of summary judgment on qualified immunity de novo, applying the same standard as the district court. *Timmons v. White*, 314 F.3d 1229, 1232 (10th Cir. 2003); *Maestas v. Lujan*, 351 F.3d 1001, 1007 (10th Cir. 2003). Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018).

In reviewing a grant or denial of summary judgment, we normally resolve disputed facts in favor of the party resisting summary judgment and grant that party all reasonable inferences. *Id.* But "if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim." *Id.*

Our "review of summary judgment orders in the qualified immunity context differs from that applicable to review of other summary judgment decisions."

-8-

*Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (quotation omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (quotation omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quotation omitted). In determining whether the plaintiff meets this burden, we "ordinarily accept the plaintiff's version of the facts—that is, 'the facts alleged.'" *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016) (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)). But "because at summary judgment we are beyond the pleading phase of the litigation, the plaintiff's version of the facts must find support in the record." *Id.* (alterations incorporated) (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). Thus, if the nonmoving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it," then we "should not adopt that version of the facts." *Thomson*, 584 F.3d at 1312 (quotation omitted).

Mindful of our standard of review, we turn to the law of qualified immunity. "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308

(2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To show defendants are not entitled to qualified immunity, a plaintiff must show that (1) "the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation," and (2) the "law was clearly established at the time of the alleged violation." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013) (quotation omitted).

A constitutional right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right. *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018). Generally, "existing precedent must have placed the statutory or constitutional question beyond debate" to clearly establish a right. *Id.* (quoting *Mullenix*, 136 S. Ct. at 308). The question is not whether a "broad general proposition" was clearly established, but "whether the violative nature of particular conduct [was] clearly established.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 308).

If a plaintiff demonstrates the officials violated a clearly established right, we consider a third question: "whether extraordinary circumstances—such as reliance on the advice of counsel or on a statute—so prevented the official from

-10-

knowing that his or her actions were unconstitutional that he or she should not be imputed with knowledge of a clearly established right." *Shero v. City of Grove*, 510 F.3d 1196, 1204 (10th Cir. 2007).

We apply this standard to J.H.'s unlawful seizure and interference with familial relationship claims in turn.

## B. Fourth Amendment Claim—Unlawful Seizure

J.H. first contends the defendants unlawfully seized J.H. by taking him from school and interviewing him without his parents' permission. He argues the officials did not have a legal basis for the detention, as there was no reasonable basis to think that J.H. was in imminent danger.

We first consider whether J.H. has adequately shown a constitutional violation—one of the requirements in the qualified immunity analysis. We turn next to the second question: whether the law was clearly established at the time of the alleged violation.

### 1. Constitutional Violation

The Fourth Amendment protects persons from "unreasonable . . . seizures." U.S. Const. amend. IV. "'The key principle of the Fourth Amendment is reasonableness . . . .'" *Florida v. Royer*, 460 U.S. 491, 514 (1983) (quoting *Michigan v. Summers*, 452 U.S. 692, 700, n.12 (1981)). Depending on the circumstances, a seizure must be supported by an arrest warrant, probable cause,

or reasonable suspicion to detain and question an individual. *See id.*; *Jones v. Hunt*, 410 F.3d 1221, 1227–28 (10th Cir. 2005); *Storey v. Taylor*, 696 F.3d 987, 992 & n.5 (10th Cir. 2012).

A seizure occurs "within the meaning of the Fourth Amendment when 'a reasonable person would believe that he or she is not free to leave.'" *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). "'[W]hether the person being questioned is a child or an adult' is 'relevant' to whether a person would have felt free to leave." *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005) (quoting *United States v. Little*, 18 F.3d 1499, 1505 n.6 (10th Cir. 1994)). A young child is seized for Fourth Amendment purposes if "no reasonable child would have believed that he was free to leave." *Hunt*, 410 F.3d at 1229 (quoting *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003)).

We have previously applied these principles to cases in which social workers seized a child.[2] For example, in *Roska*, 328 F.3d at 1244, we held social workers violated the Fourth Amendment when they seized a child from his home

---

[2] *See, e.g.*, *Malik v. Arapahoe Cty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1316 (10th Cir. 1999) (it was clearly established that officers violated the Fourth Amendment by misrepresenting facts in order to obtain judicial authorization to seize the child); *cf. Franz v. Lytle*, 997 F.2d 784, 793 (10th Cir. 1993) (police officers are not "absolved of a warrant or probable cause requirement" when investigating "claims of child abuse and neglect").

without judicial authorization or exigent circumstances. There was no compelling reason or special need of the government that made obtaining a warrant impracticable. "Simply put, unless the child is in imminent danger, there is no reason that it is impracticable to obtain [judicial authorization] before social workers remove a child from the home." *Id.* at 1242.

Yet although there is clearly "no 'social worker' exception to the Fourth Amendment," *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003), we have not definitively decided what Fourth Amendment standard governs when social workers seize a child *at school*, rather than at home. In *Hunt*, we declined to decide precisely "what Fourth Amendment test is most appropriate" when social workers seize a child at school. 410 F.3d at 1228 & n.4. Nonetheless, we held it is "clearly established" that a seizure "must be reasonable." *Id.* at 1229. The social workers' seizure in that case violated the Fourth Amendment because it transgressed even the minimal reasonable-suspicion standard from *Terry v. Ohio*, 392 U.S. 1 (1968), and was therefore unreasonable. *Hunt*, 410 F.3d at 1228.

Here, the officials took J.H. from school to a safe-house. They did not take J.H. from his home. As explained in *Hunt*, it has long been clearly established that any seizure at school without judicial authorization had to *at least* be reasonable under the minimal *Terry* reasonable-suspicion standard. In other

-13-

words, the officials at least needed to have a reasonable suspicion of an imminent threat to the safety of the child.

The parties agree the Fourth Amendment required the officials in this case to have reasonable suspicion of imminent abuse in order to seize J.H.[3] We therefore consider whether the evidence at this stage would allow a reasonable jury to find that (1) the officials seized J.H., and (2) the defendants did not have reasonable suspicion that J.H. faced a threat of imminent abuse.

To begin, we think it is clear the officials seized J.H. within the meaning of the Fourth Amendment, and the defendants do not contest this point. J.H. would not have "felt free to terminate the encounter" with Chief Goerke, who picked him up from school, or later with Deputy Calloway or Huckaby once he had been transported. *See Hunt*, 410 F.3d at 1226.

For several reasons, based on this record it is equally clear that a reasonable officer in possession of the facts could not have had reasonable suspicion that J.H. was in imminent danger.

---

[3] Some of the parties cite to *Gomes v. Wood*, 451 F.3d 1122, 1130 (10th Cir. 2006), as the source of this standard, but *Gomes* is not a Fourth Amendment case. In *Gomes*, we held that *procedural due process* (not the Fourth Amendment) requires social workers to have "reasonable suspicion of an immediate threat to the safety of the child" in order to seize a child without judicial authorization. *Id.* at 1130; *see Arredondo v. Locklear*, 462 F.3d 1292, 1298 (10th Cir. 2006) (applying this rule). But even though *Gomes* did not establish a Fourth Amendment rule, its holding hews close to Fourth Amendment doctrine, and is therefore instructive.

-14-

First, the phone call to DHS was anonymous and lacked detail. It is, of course, possible for an anonymous call to support a reasonable suspicion of an imminent threat.[4] But the call here was too vague to do so. The caller did not say that J.H. was suffering abuse at the hands of his father, or that abuse was likely to happen soon. Instead, the caller only expressed concern because J.H.'s father was a drug abuser who had been arrested for possessing drugs and a firearm. This was not enough for a reasonable officer to suspect J.H. was in imminent danger.[5]

Second, DHS itself classified the call as a Priority 2, which is a low-priority designation.[6] According to the evidence, matters on the Priority 2 list rarely lead DHS to detain a child for protective reasons. Reed testified that only "[f]ive or less" of the "several hundred priority twos that [she had seen]

_____

[4] *See, e.g.*, *Navarette v. California*, 134 S. Ct. 1683, 1688 (2014) ("[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)).

[5] As previously mentioned, a supplemental report states that the caller also alleged that J.H.'s father had abused his mother in front of him, but the authenticity of that evidence is in dispute, *see* Aplt. App. 702 n.2.—and even if true, this would not be enough to create reasonable suspicion that J.H. himself was in imminent danger.

[6] According to Reed's deposition, "[a] priority one indicates that a child is actually in immediate danger. It gives us less than 24 hours to respond. . . . A priority two can be set out two to five days depending on the hotline's risk assessment." Aplt. App. 1017. And DHS has up to "60 days" to complete the investigation on a Priority 2. *Id*. at 1024.

involved a child placed in protective custody." *See* Aplt. App. 808.  What is more, DHS itself considers a Priority 2 situation to be one where no imminent safety threat or emergency circumstances are present.  *Id.* at 1666–67, 1672.

Third, the delay between the phone call and the seizure suggests the officials themselves did not believe there was an imminent threat.  Two days elapsed from the time of the anonymous phone call DHS received on February 12 to the time the interview actually took place.  During those two days, DHS placed the matter on its low-priority list.  And even when Deputy Calloway and DHS employees discussed the matter on February 13, they concluded the interview was not necessary until the next day.  If the officials truly had reasonable suspicion that J.H. was in imminent danger, they would have acted with more urgency.

Given (1) the vagueness of the call, (2) the low-priority designation the call received, and (3) the delayed response, a reasonable jury could find a Fourth Amendment violation occurred by seizing J.H. for an interview without judicial authorization.  Indeed, there was ample time to obtain judicial authorization for protective custody as provided for by Oklahoma's statute.[7]  That the father's ex-wife had made domestic abuse allegations in the past does not change this

---

[7] As other circuits have held, a court order permitting seizure of a child for an interview is the equivalent of a warrant for Fourth Amendment purposes. *See Greene v. Camreta*, 588 F.3d 1011, 1030 (9th Cir. 2009) (collecting cases), *vacated in part on mootness grounds*, 563 U.S. 692 (2011), *and vacated in part*, 661 F.3d 1201 (9th Cir. 2011).

conclusion, as J.H.'s father was acquitted and those past allegations of abuse against his ex-wife did not indicate J.H. was in danger *in the present*.

The defendants emphasize that it is reasonable to conduct an interview at the safe-house rather than the home in order to avoid greater danger for J.H. They also explain it was also reasonable to take J.H. away from school because DHS could not conduct the forensic interview at the school. These assertions, however, miss the point. It may very well constitute a best practice to interview a child at the safe-house during school hours *once seizing the child is justified in the first place*. Unless officials have judicial authorization, however, they cannot seize a child without at least having reasonable suspicion of imminent danger.

Yet even if a reasonable officer in possession of the facts could not have had reasonable suspicion that J.H. was in danger, the defendants argue they are not liable for the Fourth Amendment violation. The arguments vary by defendant, but they generally claim the evidence shows that (1) they did not know the facts, (2) *their own* actions were reasonable (even if the actions of others were not), or (3) they did not cause the violation.

We assess these arguments one defendant at a time.[8]

_____

[8] The defendants also argue that even if they violated the Fourth Amendment, they are entitled to a good faith exception to the warrant requirement. But the good-faith exception is subsumed by the clearly-established prong of qualified immunity, which we discuss below. *See Groh v. Ramirez*, 540

(continued...)

-17-

### a. *Huckaby*

We first consider whether Huckaby's actions violated the Fourth Amendment. Huckaby had intimate knowledge about the basis for J.H.'s detention. She was the one who told Goerke to seize J.H. And she conducted the interview herself. A reasonable official in her position should have known there was no reasonable suspicion that J.H. was in imminent danger.

Huckaby nonetheless argues she merely arranged transportation and followed orders. Because she did not make the decision to seize J.H. herself, nor participate in physically taking him from school, she claims she cannot be liable for the Fourth Amendment violation. That is not so. As we explained in *Snell v. Tunnell*, "direct participation is not necessary" for liability under § 1983. 920 F.2d 673, 700 (10th Cir. 1990) (quoting *Conner v. Reinhard*, 847 F.2d 384, 396–97 (7th Cir. 1988)). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.* A reasonable jury could find Huckaby set in motion a series of events that she should have known would cause others to violate J.H.'s Fourth Amendment rights.

---

[8](...continued)
U.S. 551, 565 n.8 (2004); *United States v. Dunn*, 719 F. App'x 746, 752 n.5 (10th Cir. 2017).

Additionally, Chief Goerke testified that Huckaby falsely told him there was a verbal court order authorizing the interview. If the jury found this to be true, it could find Huckaby violated the Fourth Amendment. Since there is a genuine dispute of fact as to whether Huckaby did so, the district court correctly denied summary judgment on the Fourth Amendment claim.

### b. Deputy Calloway

In light of the evidence at summary judgment, a reasonable jury also could find Deputy Calloway violated the Fourth Amendment. It is undisputed that Deputy Calloway participated in the discussions leading to J.H.'s seizure and at least acquiesced in the decision to seize J.H. His involvement gave him knowledge about J.H.'s specific circumstances.

On the day of the seizure, Deputy Calloway's court duties were lasting longer than expected and he was no longer sure he could timely transport J.H. to the interview. He therefore instructed Reed to contact Chief Goerke to arrange alternate transportation. A jury could find this instruction set in motion a series of events that caused the seizure to occur. Deputy Calloway also set up recording equipment for the interview and transported J.H. back to school after it was over. These facts would allow a reasonable jury to find Deputy Calloway violated the Fourth Amendment by seizing J.H. without the necessary reasonable suspicion.

Summary judgment is also inappropriate for Deputy Calloway for a

second, independent reason. As the district court explained, there is a material fact in dispute. DHS investigator Reed testified that it was Calloway's idea to seize J.H. If the jury found this testimony to be true, Calloway would be responsible for J.H.'s seizure.

### c. *Chief Goerke*

As for Chief Goerke, we find it unnecessary to decide whether or not there is sufficient evidence for a jury to find his actions violated the Fourth Amendment. Even if the jury found his actions unconstitutional, the violation would not have been clearly established. We explain this in more detail below.

### 2. *Clearly Established Law*

We now turn to the second part of our qualified immunity analysis. Even if the officials here "violated the Fourth Amendment, they are entitled to immunity if no clearly established law would have informed them that [their conduct] was improper" and violated a constitutional right. *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 867 (10th Cir. 2016).

As explained above, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011). But a prior case need not be exactly parallel to the conduct here for the

officials to have been on notice of clearly established law. "[G]eneral statements of the law" can clearly establish a right for qualified immunity purposes if they apply "with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

As before, we analyze this question separately for each defendant.

### a. *Huckaby*

It was clearly established at the time of the seizure in this case that a social worker needs at least reasonable suspicion of abuse in order to seize a child at school. *See Hunt*, 410 F.3d at 1230. This rule is sufficiently specific to constitute clearly established law placing officials on notice that the seizure here violated the Fourth Amendment. *See Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1206 (10th Cir. 2006). And even if it is a general rule of law, it applies here with obvious clarity. *See United States v. Lanier*, 520 U.S. 259, 271 (1997).

The thrust of the claim against Huckaby is that she did not have reasonable suspicion when directing and effecting the seizure of J.H. If a jury were to find this fact, it would constitute a violation of clearly established law. Because this requirement should have put Huckaby on notice that seizing without reasonable suspicion would violate J.H.'s constitutional rights, we find clearly established law applies to Huckaby's purported conduct.

-21-

Indeed, we note that Oklahoma law tracks this Fourth Amendment standard, requiring "reasonable suspicion" that a child is in need of immediate protection due to an "imminent safety threat" before an officer may take a child into custody without a court order. Okla. Stat. tit. 10A, § 1-4-201(A)(1). "[W]hile we do not look to state law in determining the scope of federal rights, the fact that [state law] limited the power of police . . . in precisely the manner the Fourth Amendment would limit such power is indicative of the degree to which the Fourth Amendment limit was established." *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 595 (10th Cir. 1999). Oklahoma law also should have put Huckaby on notice that her conduct would violate J.H.'s constitutional rights.

### b. Deputy Calloway

As noted earlier in our discussion of *Hunt*, the minimum standard for a seizure of a child under *Terry* has been reasonable suspicion. Because the allegations against Deputy Calloway are similar to those against Huckaby—that he planned and effected the seizure of J.H. without the requisite reasonable suspicion—he also should have been on notice that his conduct would violate J.H.'s constitutional rights.

### c. Chief Goerke

Whether Chief Goerke's actions violated clearly established law is a different story. After Deputy Calloway was unable to pick up J.H. at school,

-22-

Huckaby asked Chief Goerke to transport J.H. to the safe-house. Goerke testified that Huckaby told him a court had authorized the seizure. Huckaby contests this claim, but she does not disagree that Goerke was ignorant of the specific facts leading to J.H.'s seizure. Rather, the evidence at summary judgment supports Goerke's claim that he relied on the direction of DHS officials without knowing specifics. Goerke argues he was entitled to assume that if DHS officials asked him to pick up J.H., they must have had good reasons to suspect J.H. was in danger.[9]

Since the undisputed evidence at this stage supports Chief Goerke's claim that he merely relied on the DHS officials' directions, we conclude Chief Goerke is entitled to qualified immunity. Generally, "[a] police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable.'" *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir.

---

[9] J.H. argues that Goerke forfeited this argument by failing to raise it before the district court, but Goerke raised this argument in his brief in support of summary judgment. *See* Aplt. App. 142 ("These facts certainly indicate a reasonable officer, having been called by a member of the Child Abuse Task Force, for the very purpose of protecting a child, would transport the child to ABC House for a forensic interview."); *id.* at 143 ("Defendant Goerke's limited role in transporting J.H. for an interview consistent with DHS investigations was certainly reasonable.").

2010)).  And J.H. provides no cases clearly establishing that officers cannot rely on DHS officials just as much as on fellow officers.  Chief Goerke thus did not violate clearly established law by relying on DHS officials' instructions without conducting his own investigation.

J.H. disagrees.  He contends that (1) there is evidence to suggest that Chief Goerke did *not* simply rely on the assessment of others, (2) Chief Goerke had a duty to independently assess reasonable suspicion himself, and (3) Chief Goerke's reliance was unreasonable.  We are unpersuaded.

First, there is no evidence that Chief Goerke did more than fulfill a DHS official's request that he assumed to be justified.  The only evidence J.H. produces to the contrary is the statement Chief Goerke made to J.H. while driving him to the safe-house: that "they were taking him to meet some people that [were] going to get him to a better home, a safer home where there's no violence."  Aplt. App. 603–604.  Contrary to J.H.'s assertions, this is not enough for a reasonable jury to conclude Chief Goerke was aware of a plan to unconstitutionally seize J.H.  Rather, it fits Chief Goerke's otherwise undisputed story: he did not know the particular facts, but assumed DHS officials requested an interview with J.H. because they suspected he was being abused.  The record, then, shows Chief Goerke simply relied on the request of a DHS official.  J.H. points us to no

evidence placing this fact in *genuine* dispute.[10]  *See Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278, 1283 (10th Cir. 2018) ("[N]ot every factual dispute will properly preclude the entry of summary judgment; the dispute must be genuine . . . ." (quotation omitted)).

Second, it was not clearly established that Goerke had a duty to independently investigate the facts of the case prior to seizing the child—especially on matters related to purportedly exigent circumstances involving the safety of a child.  J.H. provides no case establishing such a duty.

Third, Chief Goerke's reliance was reasonable.  J.H. argues that when Chief Goerke picked him up at school, he clearly saw there was no emergency. Under J.H.'s line of reasoning, Chief Goerke should have then realized that DHS did not have reasonable suspicion of danger, or else should have called to verify the basis for the seizure.  This argument fails to take into account an obvious fact: Chief Goerke could have reasonably assumed the danger did not lie at school, but at home.  If a child faces an imminent threat of abuse upon returning home from school, a DHS official would likely have grounds to request the child's seizure while still at school.

---

[10]  Indeed, J.H. himself sometimes paints Chief Goerke as an unknowing pawn.  For instance, his own complaint alleged that "Calloway and/or Huckaby *used Goerke* to intentionally circumvent state law to seize J.H. without warrant or probable cause."  Aplt. App. 68–69 ¶ 24 (emphasis added).

With no clearly established law to the contrary, we conclude Goerke's actions were a reasonable response to what he could have assumed to be an adequately supported child welfare investigation. *Cf. Sjurset v. Button*, 810 F.3d 609, 618 (9th Cir. 2015) (concluding officers did not violate clearly established law by relying on an erroneous determination by the Oregon Department of Human Services that a child should be removed from home). Chief Goerke was not "plainly incompetent." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Nor did he "knowingly violate the law." *Id.*

\* \* \*

We therefore conclude only Huckaby and Deputy Calloway violated clearly established Fourth Amendment law. Chief Goerke did not, and he is entitled to qualified immunity on the Fourth Amendment claim.

### 3. *Objectively Reasonable*

Even if their actions violated clearly established law, Huckaby and Deputy Calloway nonetheless contend they are entitled to qualified immunity because their actions were objectively reasonable. Huckaby and Deputy Calloway claim they acted in reliance on the Oklahoma Children's Code, which they argue authorizes the detention of a child under these circumstances.

-26-

Once a plaintiff shows a constitutional violation and that it was clearly established, "it becomes defendant's burden to prove that her conduct was nonetheless objectively reasonable." *Roska*, 328 F.3d at 1251. "Of course, an officer's reliance on an authorizing statute does not render the conduct per se reasonable." *Id.* "Rather, 'the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional.'" *Id.* at 1252 (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994)). To determine whether statutory authorization renders an official's unconstitutional conduct objectively reasonable, we consider "(1) the degree of specificity with which the statute authorized the conduct in question; (2) whether the officer in fact complied with the statute; (3) whether the statute has fallen into desuetude; and (4) whether the officer could have reasonably concluded that the statute was constitutional." *Id.* at 1253.

Because the statute cannot reasonably be read to authorize the conduct in question, we conclude Deputy Calloway's actions were not objectively reasonable; we also conclude for this reason that Huckaby's actions were not objectively reasonable.

Under Oklahoma law, when DHS receives a report of "child abuse or neglect," it must "promptly respond to the report by initiating an investigation."

-27-

Okla. Stat. tit. 10A, § 1-2-105(A)(1).  The investigation "shall include" a visit and interview with the child.  *Id.* § 1-2-105(B)(1).  The visit "may be conducted at any reasonable time and *at any place* including, but not limited to, the child's school."  *Id.* (emphasis added).

Huckaby and Deputy Calloway argue that because the statute allows social service personnel to interview a child "at *any* place," *id.* (emphasis added), they could reasonably conclude it authorized them to detain and transport a child to a forensic interview facility.

But Huckaby and Deputy Calloway ignore that a *different* section of the code provides the requirements for taking a child into custody without a court order.  That section—titled "Circumstances authorizing taking a child into custody"—requires "reasonable suspicion" that the child is in need of immediate protection due to an "imminent safety threat."  *Id.* § 1-4-201(A)(1).  It makes little sense to interpret an authorization to interview "at any place" as a loophole allowing officers to detain children anywhere without consent, a court order, or reasonable suspicion of an imminent threat.

Furthermore, that the Code authorizes interviews "at any place" does not authorize DHS to take a child *into custody* anywhere and everywhere.  The authorization to interview "at any place" is certainly not the same as authorization to take the child into custody.  In fact, this same section acknowledges that DHS

-28-

officials might not be able to interview the child because they are not allowed to enter the "place where the child may be located." Okla. Stat. tit. 10A, § 1-2-105(B)(2). In that situation, the Code provides that officials may seek a court order allowing them to enter and interview the child. *Id.* The authorization to interview a child therefore cannot be read as *carte blanche* authorization to take custody of a child "at any place."

Oklahoma law therefore did not make Huckaby's actions objectively reasonable, nor did it make Deputy Calloway's actions objectively reasonable.[11]

Deputy Calloway also argues his actions are objectively reasonable because he reasonably relied on DHS's determinations that J.H.'s seizure was justified. There is evidence that it was Deputy Calloway's idea to seize J.H., so there is a genuine dispute of fact that would preclude summary judgment on this basis. Even if we did not deny summary judgment because of the factual dispute, Deputy Calloway's argument that he was objectively reasonable in relying on DHS would still fail. It is true that "[a] police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity.'" *Felders*, 755 F.3d at 882 (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir. 2010)). But that

---

[11] Since we find Oklahoma law clearly did not authorize J.H.'s detention, we find it unnecessary to address J.H.'s argument that Deputy Calloway forfeited this argument.

only holds "as long as the officer's reliance was objectively reasonable." *Id.* Since Deputy Calloway knew the facts surrounding J.H.'s case, it was not objectively reasonable for him to go along with DHS's patently erroneous determination.

\* \* \*

In sum, we hold that Chief Goerke is entitled to summary judgment on the basis of qualified immunity because he did not violate clearly established law. On the other hand, we hold a reasonable jury could, based on the evidence at this stage, find that Deputy Calloway and Huckaby violated clearly established Fourth Amendment law.

There are surely situations in which exigent circumstances could justify an interview of the sort Deputy Calloway and Huckaby helped arrange, and we would not want the fear of "lawsuits [to] distract from the performance of public duties" in those circumstances. *See Gomes*, 451 F.3d at 1134. But the circumstances here do not create this risk. Neither Deputy Calloway's conduct nor Huckaby's conduct reflected the sort of behavior one would expect if there had truly been an imminent threat. Had the officials held an incorrect but objectively reasonable suspicion that J.H. was subject to an imminent threat, qualified immunity would apply. But in the absence of reasonable suspicion, we

agree with the district court that a reasonable jury can find Huckaby and Deputy

Calloway violated the Fourth Amendment.

### C. Fourteenth Amendment Claim—Interference with Familial Association

Huckaby and Deputy Calloway also contend they are entitled to qualified

immunity on J.H.'s Fourteenth Amendment familial association claim. They

argue J.H. has failed to make the requisite showing of a clearly established

interference with familial association.

#### 1. Legal Standard

Before addressing the specifics of J.H.'s claim, we explain our circuit's

somewhat confusing law on familial association claims. We have explained that

the "familial right of association" is a substantive due process right. *See Griffin

v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993). We have therefore allowed

constitutional tort claims alleging infringements of this right. And, naturally, we

have elucidated a test to govern our analysis of these claims. *See Thomas v.

Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014).

Our circuit, however, has not fully explained the relationship between this

test and the general substantive due process frameworks the Supreme Court has

devised. *See Dawson v. Bd. of Cty. Comm'rs*, 732 F. App'x 624, at 632–35 (10th

Cir., 2018) (Tymkovich, J., concurring), *petition for cert. filed* (U.S. Aug. 6,

2018) (No. 18-177). The Supreme Court has identified substantive due process

cases that turn on whether the government has infringed a right that is "fundamental."  *Washington v. Glucksberg*, 521 U.S. 702, 721–722 (1997) (examining an asserted right to assistance in committing suicide).  Other times, the legal test simply asks if the government action deprives a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience.  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (examining a high-speed police chase).  There is uncertainty about when we apply these various tests, *see Moya v. Garcia*, 887 F.3d 1161, 1174 (10th Cir. 2018) (McHugh, J., concurring in part and dissenting in part), but as explained in recent cases, our circuit has coalesced around a solution: we apply the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*.  *See Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 (10th Cir. 2015); *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009); *Dawson*, at *10–11 (Tymkovich, J., concurring).

The question is: where do substantive due process familial association claims fit into this framework?  Our cases have not clearly answered that.  Most often, the issue has gone unnoticed.  *See, e.g.*, *Thomas*, 765 F.3d at 1195–96; *Lowery v. Cty. of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008); *J.B. v. Washington Cty.*, 127 F.3d 919, 928 (10th Cir. 1997).  In our cases, we have explained a

constitutional claim of interference with the right to familial association requires two showings: (1) that the "defendants intended to deprive [the plaintiffs] of their protected relationship" with a family member, and (2) that "balancing the [plaintiffs'] interest in their protected relationship . . . against the state's interest in [the family member's] health and safety, defendants either unduly burdened plaintiffs' protected relationship or effected an unwarranted intrusion into that relationship." *Thomas*, 765 F.3d at 1196 (internal quotations and citations omitted). But those cases were silent on whether we were using the fundamental-rights or shocks-the-conscience approaches.

Our silence on the requisite approach does not mean familial association claims comprise a third, separate, and solitary branch of substantive due process doctrine. No good reason exists for our analysis of a claim asserting interference with familial association to be any different from our analysis of a claim asserting other government interference—for instance, gross intrusions into bodily integrity or personal safety.[12]

---

[12] *See, e.g.*, *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (explaining that "[t]he ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges" in a case involving the right to bodily integrity (quotation omitted)); *Perez v. Unified Gov't of Wyandotte Cty./Kansas City*, 432 F.3d 1163, 1166 (10th Cir. 2005) (explaining that "[o]nly government conduct that 'shocks the conscience' can give rise to a substantive due process claim" in a case involving a fire truck collision).

Instead, familial association claims—properly understood—fit neatly within the two-approach scheme our cases elaborate. Typically, a plaintiff pressing this claim alleges that an official interfered with the right to familial association in some way. Since such allegations challenge *executive action*, the shocks-the-conscience approach applies.[13] The legal test our cases use, then, simply describes the kind of behavior we find to shock the conscience in this context. Namely, it shocks the conscience when: (1) the officials intended to deprive the plaintiff of a protected relationship with a family member, and (2) the officials' intrusion into the relationship was not warranted by state interests in the health and safety of the family member. *Thomas*, 765 F.3d at 1196.[14] Together, the

_____

[13] It is possible that a plaintiff might sue a government entity for a legislative rule that unduly interferes with familial association. Under the approach explained here, we would review such a claim under the "fundamental rights" approach—asking whether the right to familial association is a "fundamental" right in order to determine what level of scrutiny to apply to that legislative action. Indeed, it would not make sense to try to apply our normal two-pronged test to general legislation, as our test requires *intent to interfere* with the plaintiff's particular family relationship.

[14] Other circuits also recognize that familial association claims are governed by the shocks-the-conscience standard. *See Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) ("*Lewis* clarified that the shocks-the-conscience test, first articulated in *Rochin v. California*, 342 U.S. 165 (1952), governs all substantive due process claims based on executive, as opposed to legislative, action"—including familial association claims); *Anthony v. City of New York*, 339 F.3d 129, 143 (2d Cir. 2003) (to prevail on a familial association claim, a plaintiff "must demonstrate that her separation from [her child] was so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it" (internal

(continued...)

facts alleged by the plaintiff on these points must meet the shocks-the-conscience standard.

A comparison between our two-pronged test for familial association claims and our case law on the shocks-the-conscience test reveals how close the two really are. For executive action to shock the conscience requires much more than mere negligence. *E.g.*, *Moore*, 438 F.3d at 1040. Indeed, even the actions of a

---

[14](...continued)
quotations omitted)); *see also United States v. Hollingsworth*, 495 F.3d 795, 802 (7th Cir. 2007) (implying that a claim for violation of familial association must show the government conduct shocks the conscience).

Not all circuits agree. *Compare Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585 (6th Cir. 2013) (explaining the shocks-the-conscience standard only applies when a claim does not have to do with a specific substantive due process right, and concluding the shocks-the-conscience standard therefore does not apply to familial association claims), *with Kottmyer v. Maas*, 436 F.3d 684, 691 n.1 (6th Cir. 2006) (suggesting a plaintiff could prevail on a familial association claim if the conduct shocked the conscience), *and Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (for a familial association claim "[t]o amount to a violation of substantive due process . . . the harmful conduct must shock the conscience or offend the community's sense of fair play and decency" (alterations incorporated) (internal quotations omitted)); *with Crowe v. Cty. of San Diego*, 608 F.3d 406, 441 n.23 (9th Cir. 2010) (concluding the shocks-the-conscience standard does not apply to familial association claims); *see also Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999) (apparently treating the shocks-the-conscience standard as one of multiple ways in which a plaintiff could assert a familial association claim).

To be sure, though, many other circuits' cases—like many of our own—simply do not mention the issue. *See, e.g.*, *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1019 (7th Cir. 2000); *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1371 (8th Cir. 1996).

reckless official or one bent on injuring a person do not necessarily shock the judicial conscience. *Id.* "Conduct that shocks the judicial conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (quoting *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008)). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or 'employed it as an instrument of oppression.'" *Id.* (quoting *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) (alterations incorporated)). "The behavior complained of must be egregious and outrageous." *Id.*; *see Lewis*, 523 U.S. at 847; *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) ("We set aside the conviction because such conduct 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency.").

Our two-pronged test for familial association claims reflects these principles. The plaintiff must show that the officials "*unduly* burdened" or created an "unwarranted intrusion" on the plaintiff's right to familial association. *Thomas*, 765 F.3d at 1196 (emphasis added). And whether the officials *unduly* burdened the family relationship depends on "the *severity* of the infringement on the protected relationship, the need for defendants' conduct, and possible

alternative courses of action," *id.* (emphasis added)—as would all applications of the shocks-the-conscience standard.

The test's intent requirement is even greater proof of its shock-the-conscience heritage. Under our cases, merely negligent interference with a family relationship will not do: the officials must have *intended* to burden the relationship. That is just like the shocks-the-conscience standard. *See Lewis*, 523 U.S. at 863–864. Indeed, when our court first applied this intent requirement in *Trujillo v. Board of County Commissioners*, 768 F.2d 1186 (10th Cir. 1985), we did so to prevent this doctrine from turning all negligent torts leading to the death of a child into constitutional violations. *Id.* at 1190. Some degree of severity was required, we explained, to "provide a logical stopping place for such claims." *Id.*

In short, we clarify that familial association claims are grounded in the shocks-the-conscience approach to substantive due process claims challenging executive action. We have not always mentioned the shocks-the-conscience formulation, but a close look reveals our two-pronged test for these claims has been a manifestation of the shocks-the-conscience standard all along. *See Griffin*, 983 F.2d at 1548–49 ("[T]here is no evidence or allegation that the conduct going to Dorothy Griffin's familial rights of association claims involved . . . *conduct that shocks the conscience*." (emphasis added)). When a plaintiff meets our two-pronged test, the plaintiff has shown an official's actions shock the judicial

conscience. But in applying our test, and in particular the balancing it requires, we must keep in mind our ultimate inquiry is whether each defendant's conduct shocks the judicial conscience.

## 2. Application

Having clarified this confusion in our prior cases, we turn to the claim at issue here. To make a threshold showing that the officers violated J.H.'s substantive due process right to familial association—that is, their actions shocked the judicial conscience—J.H. must provide evidence as to both requirements outlined above: (1) intent to interfere with the family relationship and (2) an unwarranted and severe intrusion. Together, the evidence with respect to these elements must show executive action by government officials so arbitrary and capricious that it amounts to conduct that shocks the conscience. The district court here did not err in this regard: it considered the familial association test part of the shocks-the-conscience inquiry. *See* App. 659.

J.H. contends this case satisfies these requirements. In his view, he has provided evidence that these officials had a personal vendetta against his father and intentionally set out to destroy his father's relationship with J.H. Additionally, J.H. argues the evidence shows the interference with his family relationship was unwarranted. J.H. claims that removing him from school for a forty-minute interview was such a severe interference with his family

relationship, and so far removed from any reasonable concern for his safety, that the seizure and interview are the kind of unwarranted interference with family relationships that shock the conscience. This evidence, J.H. argues, demonstrates a violation of clearly established law, and allows him to survive the defendants' motion for summary judgment.

We need not decide whether the record here demonstrates a constitutional violation. Even if the officials *did* violate J.H.'s substantive due process rights, we conclude the right was not clearly established, and so the defendants are entitled to qualified immunity. In particular, we find J.H. has not shown that reasonable officials would have known that the short seizure here would constitute an unwarranted interference with a family relationship—the second part of our test for substantive due process familial association claims.[15]

As earlier explained, "[t]o determine whether the right was clearly established, we ask whether 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Henderson v. Glanz*, 813 F.3d 938, 951 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[E]xisting precedent must have

---

[15] We do not decide whether J.H. presented enough evidence for a reasonable jury to find Huckaby and Deputy Calloway intended to interfere with J.H.'s relationship with his father—the first element.

placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

In making this determination, we are mindful of two pitfalls. We can neither require *too much* factual similarity between an existing case and the case at hand, nor *too little*. There "need not be a case precisely on point." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018). But at the same time, "it is a 'longstanding principle that clearly established law should not be defined at a high level of generality.'" *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). And while general statements of law can sometimes provide fair warning that certain conduct is unconstitutional, they only do so if they "apply with obvious clarity to the specific conduct in question." *United States v. Lanier*, 520 U.S. 259, 271 (1997). "General legal standards therefore rarely clearly establish rights." *Redmond*, 882 F.3d at 939.

The facts here do not meet this high bar. Even if the officials had the requisite intent—thus satisfying the first part of our test—their actions still must constitute an undue burden on J.H.'s right of familial association. We are not aware of a case from our court or the Supreme Court clearly establishing that the short seizure and interview here would unduly burden J.H.'s relationship with his family members.

J.H. points to *Roska*, 328 F.3d at 1250, and *Malik*, 191 F.3d at 1315, as support, but these cases fall short of what we require for rights to have been clearly established. In each, we applied the general rule that parents have "a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures." *Roska*, 328 F.3d at 1250 (quoting *Malik*, 191 F.3d at 1315). And in each, we found the procedures used to remove a child from the family home or terminate parental custody fell below the requirements of the Due Process Clause. *Roska*, 328 F.3d at 1246; *Malik*, 191 F.3d at 1316.

But these cases do not help J.H. To begin, both *Roska* and *Malik*, are *procedural* due process cases—not *substantive* due process familial association cases. *See also Hollingsworth v. Hill*, 110 F.3d 733, 738–740 (10th Cir. 1997) (examining a procedural due process claim stemming from a child seizure). J.H. has only pleaded and argued a violation under our two-part substantive due process test for interference with familial association, not procedural due process. *See* Aplt. App. 70; Aple. Br. at 35–36.

Yet even if J.H. had argued a procedural due process claim here, those cases would not have established a violation of his rights. The officials in *Malik* obtained judicial authorization to remove a child from her home by misrepresenting the facts to a magistrate judge. 191 F.3d at 1312, 1316. And the defendants in *Roska* seized the child from his home without judicial authorization

-41-

and temporarily terminated parental custody. 328 F.3d at 1238, 1246. The case here did not involve a seizure from the child's home—much less a termination of parental rights. Rather, the officials here only took J.H. from school and interviewed him for less than an hour.

Aside from *Roska* and *Malik*, J.H. has not pointed to any other cases that could clearly establish the right at issue here. J.H. need not provide a case with exactly the same facts, of course. But he has not provided a case with even remotely similar facts. Nor has he shown that our general statements of law in this area demonstrate the unconstitutionality of the officials' actions here with "obvious clarity." *Lanier*, 520 U.S. at 271.

Indeed, our general rule that interference with family relationships cannot be "unduly burdened" is too general a proposition to have clearly established the alleged violation here. The officials would not have known that taking J.H. from school for a short interview would necessarily constitute an "undue burden" or "unwarranted intrusion" into a family relationship. To determine when an official's action unduly burdens the plaintiff's right to familial association, we look at several factors—including "the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action." *Thomas*, 765 F.3d at 1196. And when a rule of law requires that competing interests be balanced, "the law is less likely to be well established

-42-

than in other areas." *See Melton v. City of Okla. City*, 879 F.2d 706, 729 (10th Cir. 1989). It was not "beyond debate" that the balance of these considerations would necessarily make the interview an undue burden on J.H.'s familial association rights. *Ashcroft*, 563 U.S. at 741. Even if the officials did not have reasons to suspect J.H. was in imminent danger, the referral shows they did have *some* basis to be concerned J.H. *might* have suffered abuse. And the intrusion here was certainly not as severe as those in our prior cases. The seizure's brevity, the fact J.H. was taken from school and not home, and the fact that parental rights were not being terminated could have led a reasonable official to conclude the interference was simply too insignificant to be an "undue burden" on a family relationship that shocks the judicial conscience.

J.H. appears to acknowledge the facts here are "[u]nlike cases where a child is temporarily removed from the home"—the only kinds of cases he has pointed to for support. Aple. Br. at 42. Yet he argues it was nevertheless clearly established that the severity of the interference here could constitute an unwarranted intrusion into family life because "psychological harm can be far more damaging precisely because of the confusion and distrust it sows in children who lack the emotional development to properly allocate responsibility for what happened to them." *Id.*

Perhaps it is true that short interviews like the one here can inflict great damage to family relationships, but we think the point neither obvious nor clearly

established by our case law at the time of the events in question. It does not seem obvious that questioning a child about possible abuse would greatly burden the child's relationship with his parents—even if we accept that physical removal can sometimes be traumatic for the child.[16]

Having found that "existing precedent" did not place the "constitutional question beyond debate," we hold that Huckaby and Deputy Calloway are entitled to qualified immunity for the Fourteenth Amendment claims against them. *Ashcroft*, 563 U.S. at 741. It would not have been clear at the time that the balance between the interview's interference in J.H.'s family relationship and the officials' health and safety concerns made their actions so burdensome to the family relationship as to violate substantive due process rights.

## III. Conclusion

We therefore **AFFIRM** the district court's order denying qualified immunity to Huckaby and Deputy Calloway on the Fourth Amendment claims against them. We **REVERSE** the district court's order denying qualified immunity to Chief Goerke on the Fourth Amendment claim against him. And we **REVERSE** the court's order denying Huckaby and Deputy Calloway qualified immunity on the Fourteenth Amendment claims against them.

---

[16] *See* U.S. Dep't of Justice, Law Enforcement Response to Child Abuse 11 (July 2014), https://www.ojjdp.gov/pubs/243907.pdf.