FILED
United States Court of Appeals
Tenth Circuit

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**December 1, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

DOUGLAS BRUCE, an individual,

    Plaintiff - Appellant,

v.

OGDEN CITY CORPORATION, an
incorporated city in the State of Utah;
MICHAEL P. CALDWELL, in his official
capacity as the Mayor of Ogden City
Corporation,

    Defendants - Appellees.

No. 22-4114
(D.C. No. 1:20-CV-00034-DBB)
(D. Utah)

_____

## ORDER AND JUDGMENT*

_____

Before **BACHARACH**, **BRISCOE**, and **McHUGH**, Circuit Judges.

_____

Plaintiff Douglas Bruce is a Colorado resident who owns a tract of land within

the city limits of Ogden, Utah (the City), that contains two duplexes and one cottage.

In early 2020, the City's building official directed Bruce to rehabilitate or demolish

one of the buildings on the property that had been damaged by a fire in 2018.  Bruce

failed to respond to that directive.  The building official then petitioned the City's

---

* This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

mayor to issue a demolition order. Following a hearing, the mayor ordered the building to be demolished at Bruce's expense.

Bruce responded to the demolition order by filing this action against the City and its mayor. Bruce's complaint included a Fifth Amendment takings claim, a procedural due process claim, and a substantive due process claim, all asserted pursuant to 42 U.S.C. § 1983, as well as a state law tort claim. The district court granted summary judgment in favor of defendants on all of the claims. Bruce now appeals the district court's grant of summary judgment in favor of the City. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court.

I

*Factual background*

a) *Bruce's Property in Ogden*

Bruce, a Colorado resident, has owned a tract of land (the Property) in the City since 1983. The Property contains three residential buildings—two duplexes and one cottage—which together contain a total of five residential living spaces. The Property also has two street addresses: 3166 Grant Avenue and 3172 Grant Avenue. The building assigned the address of 3166 Grant Avenue is a side-by-side duplex with two residential living spaces. The buildings assigned the address of 3172 Grant Avenue include a side-by-side duplex with two residential living spaces, and a two-bedroom cottage that is located in the rear of the property. The five residential

spaces on the Property have a combined total of five kitchens, five bathrooms, five gas meters, five electric meters, and three water meters.

The Property is treated as one tax parcel.

b)  *Zoning history of the Property*

The three buildings on the Property were built in approximately 1907, prior to any zoning by the City.

The City first implemented zoning regulations in 1951.  At that time, the Property was zoned as "R-5," which permitted the number and types of structures that exist on the Property.  Aplt. App., Vol. 2 at 14–15.

In 1984, the area in which the Property is located was rezoned as "R-2A."  *Id*. at 15.  R-2A zones generally "allow[ed] single family and duplex-type development," as well as "subdivisions for senior housing and . . . other typical accessory residential uses such as churches, schools, [and] public facilities."  *Id*. at 96.  City officials deemed Bruce's property nonconforming because the number of structures on the property exceeded the density limits of the new zone.  *Id*. at 105.  The City, however, undertook no enforcement measures against the Property during the time that the Property was zoned as R-2A.  *Id*.

According to City records, R-2 zoning areas "[t]raditionally . . . had more single family homes than duplexes."  *Id*., Vol. 1 at 65.  "This allowed [for] the creation of neighborhoods with a good mixture of housing styles and market ranges."  *Id*.  Over time, however, new development in R-2 zoning areas came to be dominated by "duplex only style neighborhoods."  *Id*.  Further, owners of new duplexes

3

typically occupied only a small percentage of those duplexes. *Id*. at 75. City officials considered "[t]his type of land use [a]s eliminating" the City's "ability to provide different market levels of housing" and instead "create[ed] a starter home only type of community." *Id*. at 65. City officials also considered "[t]his [to be] detrimental to neighborhood stability because" such neighborhoods were "always in transition," which in turn impacted local schools. *Id*. at 155. In addition, city officials expressed concern that "[t]his . . . threaten[ed] to create areas of future slum and blight." *Id*. at 88.

These trends in the R-2 zoning areas led the City, on July 18, 2000, to adopt Ordinance No. 2000-44. That ordinance prohibited the development of two-family dwellings, i.e., duplexes, within all existing two-family zones, including zone R-2A, from July 18, 2000, to January 18, 2001, so that the City could review and consider the downzoning of all or a portion of the R-2 zones to single-family zone classification.

On January 16, 2001, after lengthy consideration, public notice,[1] and public input, the City adopted Ordinance No. 2000-73 (the Ordinance). The Ordinance amended the City's zoning map and, in relevant part, reclassified the R-2A two-

---

[1] The public notice took two forms. First, the city "mail[ed] a letter or postcard to each individual property owner, to each tenant of property within [the] area being considered for a zone change, notifying them of the meeting[s], notifying them of staff to contact if they have questions about it, and also notifying them that they c[ould] either attend the meeting[s] or send . . . letter[s] regarding their concerns." Aplt. App., Vol. 2 at 92, 171. Second, the City placed a notice in the local newspaper informing the public of any upcoming meetings at which the issue would be discussed. *Id*. at 92.

family residential zones as "R-1-5," meaning single-family residential. *Id.* at 49. The Ordinance stated, however, that "legally established duplexes, currently located in the areas subject to rezoning, should not be treated as non-conforming uses and that such uses, if allowed to continue as legal confirming uses, will not have a significant impact on the goals for rezoning." *Id.* Consistent with this statement, the Ordinance resulted in the following provision being added to the City's code: "Any two-family dwelling or duplex that was in legal existence prior to January 16, 2001, shall be considered legal conforming."[2] *Id.*, Vol. 2 at 5, 28.

It is undisputed that Bruce did not judicially challenge the Ordinance at the time of its adoption. It is also undisputed that the City complied with all applicable state laws and local regulations in adopting the Ordinance.

    *c) The Property's history of noncompliance with City codes*

On or about March 7, 2005, Greg Montgomery, the City's Manager of Current Planning, issued a certificate of noncompliance regarding the Property. The certificate stated that the Property was inspected on February 15, 2005, and that "[t]he following conditions and/or use of the building and/or premises render[ed] the property in violation of Ogden City Ordinances": "Having a group dwelling (three buildings with dwelling units) on a lot that allows only one dwelling unit. Approval must be obtained to continue a use as a group dwelling." *Id.*, Vol. 1 at 238.

---

[2] This provision did not operate to render Bruce's Property as a whole legal conforming because the number of structures on the Property exceeded the density limits that existed both before and after passage of the 2001 Ordinance.

5

Beginning in late January of 2009, the City increased its efforts to enforce ordinance violations at the Property. On January 27, 2009, a City code enforcement officer visited the Property and notified Bruce that the Property was in violation of Ordinance 12-4-2 due to the presence of waste materials or junk on the Property. On February 10, 2009, a City code enforcement officer again visited the Property and advised Bruce that the Property was in violation of Ordinance 12-4-2 due to the presence of waste materials or junk on the Property. The City also advised Bruce on that date that "[d]ocuments still ha[d] not been provided" by him "for a legal Nonconforming use" of the Property "with the down zone from R-2 to R-1-5." *Id*. at 242. On March 4, 2009, a City code enforcement officer visited the Property and again advised Bruce of the waste and nonconforming use issues. The City noted that because notice of nonconformance "was given in 2004," some of "the rights were lost," but that it was aware "that the south duplex has been occupied and may have some rights." *Id*. at 243. The City advised Bruce that it was up to him "to go through the approval process" for a nonconforming use, and it advised him of who to contact in the City's planning department. *Id*.

According to Bruce, at some point in 2009, the city mailed him a notice notifying him that the Property had been downzoned to single-family residential (the 2009 Notice). Bruce alleges that, after receiving this 2009 Notice, he attempted to file an administrative appeal. Bruce alleges that the City ignored his appeal and ordered that the two units in the duplex at 3166 Grant Avenue and the unit in the rear

6

of 3172 Grant Avenue (the cottage) remain unoccupied indefinitely.  Bruce also alleges that the City instructed him to board up those units.

City code enforcement officers conducted seventeen additional inspections of the Property between April 13, 2009, and May 7, 2010.  Following each of those visits, the City sent notices to Bruce advising him of the Property's nonconformance with zone R-1-5, encouraging him to utilize the City's approval process for nonconforming uses, and asking him to advise the City of his plans for the Property.  The City also issued six citations to Bruce in 2009 due to ordinance violations at the Property.

Bruce met with Greg Montgomery, the City's Planning Manager, in early May 2010.  Following the meeting, Montgomery sent a letter to Bruce noting, in relevant part, (a) that the City mailed notices to property owners prior to the enactment of the Ordinance, (b) how the process of applying for a nonconforming use certificate works, and (c) emphasizing that a nonconforming certificate can be lost or revoked.

On eleven occasions between July 1, 2015, and November 14, 2019, the City's Code Services Department "sent abatement crews to secure the [P]roperty, remove discarded junk and debris from the yard, and/or cut the weeds." *Id*. at 268.

Beginning on June 2, 2015, the City sent sixteen Notices of Violation, fourteen Citations, and eleven Abatement Citations to Bruce regarding the Property.

7

>      *d)  Bruce's failure to establish the legal existence of a noncomplying*
>          *structure and/or a nonconforming use*

Utah law provides that "a nonconforming use or noncomplying structure may be continued by the present or future property owner."  Utah Code Ann. § 10-9a-511(1)(a).  Utah law also, however, affords municipalities with substantial regulatory authority over nonconforming uses.  More specifically, Utah law provides that municipalities "may provide for":

> (a)    the establishment, restoration, reconstruction, extension, alteration, expansion, or substitution of nonconforming uses upon the terms and conditions set forth in the land use ordinance;
> (b)    the termination of all nonconforming uses, except billboards, by providing a formula establishing a reasonable time period during which the owner can recover or amortize the amount of his investment in the nonconforming use, if any; and
> (c)    the termination of a nonconforming use due to its abandonment.

*Id*. § 10-9a-511(2).  In addition, Utah law provides that "[u]nless [a] municipality establishes, by ordinance, a uniform presumption of legal existence for nonconforming uses, the property owner shall have the burden of establishing the legal existence of a noncomplying structure or nonconforming use through substantial evidence."  *Id*. § 10-9a-511(4)(a).

Consistent with Utah law, the City's Municipal Code "allows for the preservation of nonconforming uses of land, provided that the use legally existed before its current land use designation and has been continuously maintained since the time of the adoption of the land use ordinance changing the permitted use."  Aplt. App., Vol. 1 at 27 (citing City Municipal Code § 15-6-3).  The City issues nonconforming certificates and in turn records those in the county records.

8

It is undisputed that the Property was noncompliant with City ordinances because multiple dwelling units were located on the Property, which was zoned for only one dwelling unit. *Id*. at 26, 238. As noted, the City repeatedly urged Bruce to seek a certificate for a nonconforming use for the Property.[3] Bruce, however, neither sought nor received a certificate for any nonconforming use for the Property.

*e) The demolition order*

On June 25, 2018, there was a fire in the building on the north side of the Property, i.e., the side-by-side duplex located at 3166 Grant Avenue. This building "ha[d] been vacant for an extended period of time," "lack[ed] sanitation facilities," and had been the subject of "38 calls" to the police. *Id*. at 267. "The fire damaged the exterior south wall window header and framing, and the fascia on the south side." *Id*. at 266. "The interior structure was [also] damaged from the fire, including damage to the door framing and headers as well as wall framing . . . and coverings," which "compromised the structural integrity of the building." *Id*. "The interior ceiling . . . partially collapsed from fire damage and firefighting efforts." *Id*. at 266–267.

On January 8, 2020, Steve Patrick, the City's Building Official, "declared the structure on the north side of the [Property] . . . to be a dangerous building and a

---

[3] According to the record, "a nonconformance certificate is to help people understand what their rights are, that the nonconformity exists, and that it can be lost through certain neglect items." Aplt. App., Vol. 2 at 129. In addition, "the certificate allows them to make sure that if they're selling the property, the new buyer can know that it does have those rights," i.e., "that the city actually recognizes those rights and it specifies what those rights are." *Id*.

public nuisance" under the City's ordinances. *Id*. at 265–266. On or about January 9, 2020, Patrick sent a letter to Bruce that was titled "NOTICE OF DANGEROUS BUILDING AND ORDER TO ABATE." *Id*. at 222. The letter listed the "Property Address" as "3166 Grant Avenue." *Id*. The letter stated, under the title "DESCRIPTION":

> That certain parcel with three separate structures. The structures are non-complying group dwellings, and have not been permitted by the city. The structure subject to this notice and order, henceforth referred to as "the structure" is located on the north side of the parcel with address number 3166. The structure being a wood framed two story structure facing west to the street, with wood siding, and two entrances on the west side, and an attached wood framed covered porch, and an entrance on the east and north side of the house, with a cement foundation, and cement cellar. The second structure, which is not subject to this notice and order, being a wood framed two story structure with address number 3172 located on the south side of the lot, with wood siding, and two entrances on the west side, and an attached wood framed covered porch, and an entrance on the east and north side of the house, with a cement foundation, and cement cellar. The third structure, which is not subject to this notice and order, located on the east side of the lot, being one level, with no visible house number, with an entrance on the south side of the building, with an attached lean to shed on the east side of the property, the parcel is located at 3166 Grant Ave., Ogden City, Weber County, Utah[.]
>
> ***
>
> You, and each of you, are hereby notified that pursuant to the provisions of Section 16-8A-7[] of the Code for the Abatement of Dangerous Buildings, the undersigned, as the officer charged with the administration and enforcement of said Ordinance, has caused to be inspected the buildings herein above described and has determined that said buildings are a Dangerous Buildings within terms of Ordinance 16-8A-6 A & B and particularly by reason of the following, to wit:
>
> 16-8A-6: B4. Whenever any portion thereof has been damaged by fire, earthquake, wind, flood, or by any other cause, to such an extent that the natural strength or stability thereof is materially less than it was before

10

such catastrophe and is less than the minimum requirements of the Building Code for new buildings or similar structure, purpose or location.

**On June 25, 2018, there was a fire in the structure. The fire damaged the exterior south wall window header and framing, and the fascia on the south side "Figure 1". The interior structure was damaged from the fire. The fire damage to the door framing and headers as well as wall framing and coverings have compromised the structural integrity of the building "Figure 2". The interior ceiling has collapsed from fire damage and firefighting efforts "Figure 3".**

16-8A-6: B12. Whenever the building or structure has been so damaged by fire, wind, earthquake or flood, or has become so dilapidated or deteriorated it has become: a) an attractive nuisance to children; b) a harbor for vagrants, criminals or immoral persons; or as to c) enable persons to resort thereto for the purpose of committing unlawful or immoral acts.

**The structure has been vacant for some time and lacks sanitation facilities. The water service has been off since May 21, 2003. Individuals have entered and illegally resided in the structure on numerous occasions. Since March, 2017, Ogden City Police Department has responded to 38 calls to the property "Figure 4".**

16-8A-6: B19. Whenever any building or structure, or portion thereof, is vacant or open and:
a. One or more of the doors, windows, or other openings are missing or broken;
b. One or more of the doors, windows, or other openings are boarded up or secured by any means other than conventional methods used in the design of the building or permitted for new type, unless boarded in accordance with an approved vacant building plan pursuant to article B of this chapter; or
c. In such condition that it constitutes an attractive nuisance or hazard to the public.

**The doors and windows of the structure have been broken down numerous times. The owner does not respond to requests from Ogden City Code Enforcement to close and secure the structure, remove junk from the yard, and remove people living in the**

11

**structure.  These actions constitute an attractive nuisance and hazard to the public.**

**On the following dates Ogden City Code Services sent abatement crews to secure the property, remove discarded junk and debris from the yard, and/or cut the weeds:**

1. **July 1, 2015**
2. **September 14, 2015**
3. **August 19, 2016**
4. **June 16, 2017**
5. **July 28, 2017**
6. **October 20, 2017**
7. **October 31, 2017**
8. **November 22, 2017**
9. **January 25, 2018**
10. **June 12, 2018**
11. **November 14, 2019**

YOU ARE HEREBY ORDERED to immediately vacate the premises, if the premises are not already vacant.  YOU ARE FURTHER ORDERED to obtain the proper permits as required and secure the building and to cause the building to be secured immediately.  YOU ARE FURTHER ORDERED not to lease or rent any of the buildings, and to maintain the buildings at the above address VACANT and SECURE against entry until it has been determined that said buildings are no longer dangerous by the Ogden City Building Department.

YOU ARE HEREBY ORDERED to obtain the proper demolition permits and commence to completion with reasonable diligence, demolition of said building not later than FIFTEEN (15) DAYS FROM THE DATE OF SERVICE OF THIS NOTICE, and to have said work of abatement completed within the limits of required permits.  If you fail to do so, your non-compliance will result in the buildings being abated at the direction of Ogden City, and the total cost of said abatement shall be levied as a special assessment against said property.

YOU ARE HEREBY ADVISED that all other persons having an interest in said building or land are hereby notified that they may, at their own risk and expense, so abate said buildings not later than the date herein above provided, so as to prevent the levy by Ogden City of the aforesaid special assessment on said property.

YOU ARE HEREBY FURTHER ADVISED that failure to abate (correct) the nuisance within the time specified is a misdemeanor.

YOU ARE HEREBY FURTHER ADVISED that the building or structure identified in this Notice and Order has deteriorated to a condition that has rendered it uninhabitable. Any nonconforming use pertaining to the building or structure will be lost if the building or structure is not repaired or restored within six (6) months after the date this notice is mailed to you.

YOU ARE HEREBY FURTHER ADVISED that any person having any record title or legal interest in the building may appeal the Notice and Order to the Ogden City Board of Building and Fire Code Appeals, provided the appeal is made in writing, within 10 days from the DATE OF SERVICE of such notice and order. Failure to do so constitutes a waiver of all rights to an administrative hearing and determination of the matter. SERVICE by mail in the manner herein provided shall be effective five (5) days after the date of mailing of this notice and order.

YOU ARE HEREBY FURTHER ADVISED that non-compliance of this notice and order of the appeal process, within the time specified, will result in the recordation of this order with the County Recorders Office for permanent record on the property abstract.

*Id*. at 222–26 (emphasis in original).

A notice of the declaration was sent to Bruce on January 9, 2020, ordering him to "commence with the demolition/rehabilitation of the building not later than fifteen (15) days from the date of the Notice." *Id*. at 266. Bruce failed to respond to the notice. More specifically, Bruce failed to commence demolition or rehabilitation work on the Property, did not seek to "obtain permits for either the repair or demolition of the building within the required period," and did not appeal the declaration and notice. *Id*. at 266.

On February 4, 2020, Patrick petitioned Michael Caldwell, the Mayor of the City, "to hold a hearing and order" Bruce "to show cause why [the City] should not

13

abate the dangerous building." *Id*. at 265. A hearing was scheduled for March 6, 2020, and Bruce was notified of the hearing. "Bruce appeared at the hearing via telephone and was also represented in person through his attorney, Aaron C. Garrett." *Id*. On April 8, 2020, Caldwell determined that "the building [wa]s in fact dangerous as defined in the Ogden Municipal Code and [was] a public nuisance." *Id*. at 268. Caldwell also found that Bruce "ha[d] not shown valid reasons why the city should not proceed with the demolition of the building." *Id*. Caldwell therefore ordered the building to be demolished and "the cost of such demolition" to "be recovered by a tax lien on the property." *Id*. at 269.

II

*Procedural history*

On March 16, 2020, Bruce initiated these proceedings by filing a complaint in federal district court against the City and Caldwell in his official capacity as Mayor of the City. Bruce alleged in his complaint that he first received notice from the City in 2009 "that it had changed the zoning of the Property to a single family residential zone." *Id*. at 11. Bruce further alleged that "[b]efore 2009 [he] had spent tens of thousands of dollars on renovations and upgrades to the residential units located on the Property." *Id*. Bruce alleged that he "received no hearing or other proper due process before the Property was down-zoned." *Id*. Bruce alleged that "[h]e attempted an administrative appeal" of the down-zoning, but the "City ignored his appeal," "ordered that the two units at 3166 Grant Avenue and the unit in the rear of 3172 Grant Avenue must remain unoccupied and empty forever," and "instructed

14

[him] to board up the units and otherwise close them from residential use." *Id*. at 11–12. Bruce alleged that, "[a]gainst his will, [he] complied with this order even though it meant he had lost the substantial income he could generate from these three units." *Id*. at 12. Bruce also alleged that he "had two tenants in the side-by-side duplex located at 3172 Grant Avenue, who [the] City agreed could remain in the homes until they moved." *Id*. "After that, however, [the] City [allegedly] mandated that [Bruce] could only lease one of the two units at 3172, and only one of his five units on the Property, at any given time." *Id*.

The first three causes of action alleged in the complaint sought relief under 42 U.S.C. § 1983 for various constitutional violations allegedly committed by the City and/or Caldwell. The first of those three causes of action, titled "DEPRIVATION OF PROPERTY UNDER FIFTH AMENDMENT RIGHTS," alleged that "Defendants maintain[ed] a policy, practice, custom, or procedure through which [they] downzone[d] multi-unit parcels to single-family dwellings without providing owners proper notice, reasonable ability to contest the zoning change before a neutral party, and the right to appeal." *Id*. at 15. It further alleged that "[a]s a result of this policy, practice, custom, or procedure, Defendants ha[d] unlawfully deprived [Bruce] of his private property." *Id*.

The second cause of action, titled "VIOLATION OF PROCEDURAL DUE PROCESS—FOURTEENTH AMENDMENT," alleged that Bruce's "legitimate property interest . . . in the Property was abridged, under color of state law, without appropriate due process." *Id*. at 16. More specifically, the cause of action alleged

15

that Defendants "ha[d] unlawfully deprived [Bruce] of his private property" "[a]s a result of [their] policy, practice, custom, or procedure" by which they "downzone[d] multi-unit parcels to single-family dwellings without providing owners proper notice, reasonable ability to contest the zoning change before a neutral party, and the right to appeal." *Id.*

The third cause of action, titled "VIOLATION OF SUBSTANTIVE DUE PROCESS," alleged that due to defendants' "policy, practice, custom, or procedure which prefer[red] single family units to the multi-family unit property maintained by [Bruce]," defendants "ha[d] unlawfully deprived [Bruce] of his private property" and "violated [his] substantive due process rights under the United States Constitution." *Id.* at 16–17.

The fourth cause of action alleged in the complaint was titled "INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS UNDER UTAH STATE LAW." *Id.* at 18. This cause of action alleged that "Defendants intentionally interfered with [Bruce's] existing or potential economic relations with respect to the Property" and "did so with the improper and predominant purpose of injuring [him] and his financial interest in the Property." *Id.*

On February 15, 2022, defendants filed a motion for summary judgment with respect to all of the claims asserted in Bruce's complaint. Defendants argued that Bruce's Fifth Amendment takings claim failed as a matter of law because the subject ordinance did not deprive Bruce of all economically viable uses of the Property, there was no evidence of diminution in value, and any alleged diminution in value did not

16

amount to a taking. Defendants in turn argued that Bruce's "claim of a procedural due process violation should be dismissed as a matter of law because the challenged Ordinance was the result of legislative action." *Id.*, Vol. 2 at 160. As for Bruce's substantive due process claims, defendants argued those should be dismissed because the challenged government action was not arbitrary and capricious, or capable of shocking the judicial conscience. Finally, defendants argued that Bruce's tortious interference claim was fatally flawed because he "failed and refused to provide any evidence concerning the damages sustained by him as a result of [the] City's actions." *Id.*, Vol. 1 at 46.

Bruce opposed the motion, in part. Specifically, Bruce argued that genuine issues of material fact precluded summary judgment on his constitutional claims against the City, but he "d[id] not dispute dismissal of . . . Caldwell in his official capacity [as Mayor] or the dismissal of the interference with business relations claim." *Id.*, Vol. 2 at 23 n.4.

Defendants filed a reply brief in support of their motion for summary judgment. In it, defendants argued, in relevant part, that some of the statements and admissions contained in Bruce's response to the motion for summary judgment established that his claims arose long before his complaint was filed and that, as a result, his constitutional claims were untimely. Bruce filed a surreply arguing, in relevant part, that his claims were not time-barred.

On November 8, 2022, the district court issued a written order granting defendants' motion for summary judgment. The district court concluded, as an initial

matter, that to the extent Bruce was alleging the existence of any constitutional violations stemming from the enactment of the Ordinance and the issuance of the 2009 Notice, those claims were time-barred. The district court next considered "whether a reasonable jury could find that the 2020 Demolition Order and its related proceedings were a Fifth Amendment taking without just compensation, a denial of procedural due process, or a violation of substantive due process." *Id*., Vol. 4 at 25. The district court concluded that "[b]ecause [Bruce] d[id] not allege a permanent physical invasion of the Property," it only needed to consider "whether [he] ha[d] sufficient evidence to show that either . . . the City completely deprived [him] of 'all economically beneficial use' of his property under *Lucas[ v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)] or" that "the evidence [wa]s sufficient to satisfy the *Penn Central[ Transp. Co. v. New York City*, 438 U.S. 104 (1978)] analysis." *Id*. at 26. The district court concluded that Bruce's evidence was insufficient to show a taking under *Lucas* because it did not show that defendants denied him all economically beneficial use of the Property. *Id*. at 27–29. The district court also concluded that Bruce's evidence was insufficient to show a taking under *Penn Central* because he provided no evidence of economic impact or a distinct, investment-backed expectation to maintain a nuisance; lastly, the district court concluded that regulating a nuisance is quintessential government action.

As for Bruce's procedural due process claim, the district court concluded that "[i]t [wa]s undisputed that [Bruce] ha[d] a property interest in the Property." *Id*. at 32. The district court in turn concluded that the record evidence established that

Bruce received notice from the City that it was considering demolishing one of the buildings on the Property, that Bruce was afforded a hearing, that Bruce appeared remotely at the hearing and was represented in-person through his attorney, and that the mayor rendered a decision after hearing the evidence and the arguments from both sides. *Id*. at 33. Although the district court noted that Bruce's position was that "the mayor's role as arbiter violated procedural due process," it rejected that view, noting that Bruce "fail[ed] to offer any evidence that the City's mayor faced any circumstances that would lead him not to be impartial and fair." *Id*. at 33, 34.

Finally, as for Bruce's substantive due process claim, the district court noted that the "City Code authorizes the City to abate dangerous buildings that 'endanger the life, limb, health, morals, property, safety or welfare of the general public or their occupants,'" and the "[r]ecord evidence show[ed] that the . . . City Building Official reviewed the condition and history of the structure at 3166 Grant Avenue," "observ[ed] that the structure had been vacant for years, had experienced a fire in 2018, and was the location of 38 calls to the police over the last three years," and "concluded that the property was dangerous." *Id*. at 36. The district court further noted that "[a]fter hearing from the building official and from [Bruce], the mayor also concluded that the building was dangerous and should be demolished." *Id*. The district court concluded that "[n]o reasonable jury could find that this constitutes 'outrageous' conduct." *Id*.

Final judgment was entered in the case on November 8, 2022. Bruce filed a timely notice of appeal on November 22, 2022.

19

III

In his appeal, Bruce challenges the entirety of the district court's decision granting summary judgment in favor of the City. Specifically, Bruce argues that the district court erred in concluding that (1) many of his claims were time-barred, (2) he could not establish a Fifth Amendment takings claim, (3) the mayor was a neutral decision-maker, and (4) the City's actions did not shock the conscience so as to give rise to a substantive due process claim.

"We review the district court's rulings on summary judgment de novo." *Deer Creek Water Corp. v. City of Okla. City*, 82 F.4th 972, 979 (10th Cir. 2023) (quoting *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1121 (10th Cir. 2021) (internal quotation marks omitted)). "Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a) (internal quotation marks omitted)).

*1) Statute of limitations*

In his first issue on appeal, Bruce argues that the district court erred in concluding that the statute of limitations had run on his § 1983 claims to the extent they related to downzoning. "We review whether a district court properly applied a statute of limitations de novo." *Allen v. Envtl. Restoration, LLC*, 32 F.4th 1239, 1243 (10th Cir. 2022).

Because § 1983 itself contains no statute of limitations, § 1983 claims are governed by the statute of limitations generally applicable to personal injury actions in the state where the claims arose. Thus, in this case, Utah's four-year residual

20

statute of limitations governs Bruce's § 1983 claims. *See Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995).

The district court concluded, in addressing the timeliness of Bruce's § 1983 claims, that to the extent Bruce was alleging the existence of any constitutional violations stemming from the enactment of the Ordinance or the issuance of the 2009 Notice, those claims were time-barred, but to the extent Bruce's alleged constitutional violations stemmed from the 2020 Demolition Order and the related proceedings, those claims were not time-barred. More specifically, the district court noted that "by 2009, [Bruce] had notice of the . . . Ordinance . . . and was injured by it." Aplt. App., Vol. 4 at 24. Because he "did not file this complaint until 2020, the four-year statute of limitations had long since run." *Id*. As for the 2009 Notice, the district court noted that Bruce "knew about the [notice]," "attempted to appeal it," "and then complied with it" all in 2009, "which [allegedly] caused him injury in the form of lost rental income." *Id*. "By 2013," the district court concluded, "the applicable four-year statute of limitations had expired." *Id*. Finally, the district court concluded that, to the extent Bruce's alleged constitutional violations stemmed from the 2020 Demolition Order and the related proceedings, those claims were not time-barred because Bruce "filed his complaint in March 2020, well within the four-year statute of limitations." *Id*. at 25.

Bruce argues in his appeal that "the touchstone for [his] takings and due process claims was the demolition order issued by" the Mayor "on March 6, 2020." Aplt. Br. at 11. He argues that "[i]t was through this order that [the] City ordered his

21

building demolished, which constitutes a taking under the 5th Amendment." *Id*.
More specifically, Bruce argues that "[t]he regulations" he now "challenge[s] . . .
with his lawsuit did not rise to the level of a total taking *until Appellees ordered the*
*demolition of the building* at 3166 Grant Avenue on the Property." *Id*. at 8 (emphasis
in original). "Prior to that point," Bruce asserts, "there was some theoretical residual
value for use of the Building." *Id*. Consequently, he argues, "no statute of
limitations began to run on any of [his] claims until that order for demolition was
issued, in January 2020." *Id*. at 8–9.

We begin with Bruce's assertion that the demolition order resulted in a "total
taking" of the Property. For the reasons we shall discuss below in our analysis of
Bruce's Fifth Amendment takings claim, Bruce has failed to demonstrate that the
demolition order resulted in a "total taking" of the Property. We therefore reject his
statute-of-limitations arguments to the extent that they rest on this "total takings"
theory.

Notably, Bruce does not otherwise challenge any of the conclusions that
underpin the district court's statute of limitations rulings. Specifically, he has not
challenged the district court's determinations that he "received notice of the
[Challenged Ordinance] no later than 2009, when Defendants mailed him [the 2009
Notice]," or that "Defendants began enforcing the ordinance on the Property" in
2009. Aplt. App., Vol. 4 at 24. Nor does Bruce challenge, at least directly, the
district court's conclusion that because he "did not file this complaint until 2020, the
four-year statute of limitations had long since run," meaning that "[a]ny

22

constitutional violations resulting from the . . . Ordinance are time-barred." *Id*.

Lastly, Bruce does not challenge the district court's conclusion that "[b]y 2013, . . .

the applicable four-year statute of limitations had expired" on any claim arising out

of the 2009 Notice.  *Id*.

We therefore affirm the district court's statute-of-limitations rulings.

*2)  The Fifth Amendment Takings claim*

Bruce argues that the district court erred in granting summary judgment in

favor of the City on his Fifth Amendment takings claim.  Bruce argues in support that

"all economically beneficial use of" the Property "has been eliminated by the

municipal demolition order."  Aplt. Br. at 13.  According to Bruce, "[n]o additional

or replacement building will be permitted to be built" on the Property at 3166 Grant

Avenue, "as it is considered [by the City to be] one in the same with the buildings

located at 3172 Grant Avenue," "and the revised local ordinances do not allow

multiple units on one parcel."  *Id*. at 14.  "As such," Bruce argues, "by ordering the

demolition of the Building at 3166 Grant Avenue, [defendants] have forced [him] to

hold the ground fallow and unused, and have erased any economic use of that

property."  *Id*.

"The Fifth Amendment's Takings Clause provides that 'private property [shall

not] be taken for public use, without just compensation.'"  *N. Mill St., LLC v. City of

Aspen*, 6 F.4th 1216, 1224 (10th Cir. 2021) (quoting U.S. Const. amend. V).  "The

Supreme Court has recognized that government regulation of private property may, in

some instances, be so onerous that its effect is tantamount to a direct appropriation or

ouster—and that such regulatory takings may be compensable under the Fifth Amendment." *Id.* (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) (internal quotation marks omitted)). "The Court has identified two categories of regulatory action that are per se takings: (1) where government requires an owner to suffer a permanent physical invasion of her property—however minor, and (2) regulations that completely deprive an owner of *all* economically beneficial use of her property." *Id.* (quoting *Lingle*, 544 U.S. at 538) (internal quotation marks omitted).

In addition to these two categories of per se takings, "a taking still may be found" "when a regulation impedes the use of property without depriving the owner of all economically beneficial use." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017). In such situations, "a taking . . . may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Id.* (internal quotation marks omitted).

"A central dynamic of the Court's regulatory takings jurisprudence . . . is its flexibility," by which courts "reconcile two competing objectives central to regulatory takings doctrine." *Id.* at 394. "One is the individual's right to retain the interests and exercise the freedoms at the core of private property ownership." *Id.* Second "is the government's well-established power to 'adjus[t] rights for the public good.'" *Id.* (quoting *Andrus v. Allard*, 444 U.S. 51, 65 (1979)). In balancing these two competing objectives, "the analysis must be driven by the purpose of the Takings

24

Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id*. (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617–18 (2001)) (internal quotation marks omitted).

In determining whether a regulatory taking has occurred, a reviewing court must determine "the proper unit of property against which to assess the effect of the challenged governmental action." *Id*. at 395. That is "[b]ecause [the] test for regulatory taking requires" a reviewing court "to compare the value that has been taken from the property with the value that remains in the property." *Id*. (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)) (internal quotation marks omitted). "To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question." *Id*. (quoting *Concrete Pipe & Products of Cal., Inc v. Constr. Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 644 (1993)).

In this case, Bruce effectively argues that the proper unit of property against which to assess the effect of the challenged governmental action is the "building and property located at 3166 Grant Avenue," i.e., the specific building that is the subject of the demolition order. Aplt. Br. at 12 (capitalization omitted). The City argues, in contrast, that the proper unit of property for purposes of analysis is "the entire subject parcel," i.e., the Property. Aple. Br. at 17.

We conclude that the City has the better of the argument. In *Murr*, the Supreme Court noted that it "has declined to limit the parcel in an artificial manner to the portion of property targeted by the challenged regulation." 582 U.S. at 396. The Court also held that "courts should give substantial weight to the treatment of the land, in particular how it is bounded or divided, under state and local law." *Id*. at 397. In this case, it is undisputed that, although the Property encompasses two street addresses, it is a single parcel of real estate that the state and the City have long treated as one tax parcel, and that the City has treated as a single unit for purposes of zoning. Thus, in assessing whether the demolition order resulted in a taking for purposes of the Fifth Amendment, we conclude we must treat the Property as a whole as the "proper unit of property against which to assess the effect of the challenged governmental action," rather than simply the building that is the subject of the demolition order. *Id*. at 395.

As the Supreme Court has noted, defining the proper unit of property is often "outcome determinative." *Id*. That is because "the relevant question . . . is whether the property taken is all, or only a portion of, the parcel in question." *Id*. (quoting *Concrete Pipe*, 508 U.S. at 644). And that is true here, at least in part. Even assuming that the demolition order resulted in a taking by the City of the portion of the Property associated with 3166 Grant Avenue, that portion represents only part of the Property. More specifically, there is no evidence that the demolition order required Bruce "to suffer a permanent physical invasion" of the Property or "completely deprive[d]" him "of all economically beneficial use of" the Property.

26

*N. Mill St.,* 6 F.4th at 1224 (quoting *Lingle*, 544 U.S. at 537). Indeed, as the district court correctly noted, Bruce may still rent, occupy, or sell the Property after the offending duplex is demolished. Thus, the Property in its entirety was not taken by the demolition order. Consequently, that eliminates the possibility that the demolition order resulted in a per se taking of the Property.

That leaves only the possibility of a taking "based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 582 U.S. at 393. With respect to the first of these factors, the district court concluded that Bruce "provided no evidence of the value that remains in the Property or of the value that has been taken by the demolition order." Aplt. App., Vol. 4 at 30. With respect to the second factor, the district court concluded that when Bruce purchased the Property in 1983, he had no distinct, investment-backed expectation in maintaining a nuisance. *Id.* (capitalization omitted). Consequently, the district court concluded that "the 2020 Demolition Order did not interfere with [Bruce]'s distinct investment-backed expectations." *Id.* at 31. Lastly, with respect to the third factor, the district court concluded that "[r]egulating a nuisance is quintessential government action." *Id.* The district court further noted that Bruce "offer[ed] no evidence that the duplex at 3166 Grant Avenue is not a nuisance," and that, "[i]nstead, the unrebutted evidence show[ed] that the building is dangerous because it is structurally deficient and left unsecured." *Id.* Notably, Bruce does not discuss these three factors at all in his

27

opening appellate brief, let alone make any attempt to rebut the district court's conclusions regarding these factors.

We therefore conclude that the district court correctly granted summary judgment in favor of the City on Bruce's Fifth Amendment Takings claim.

*3) The procedural due process claim*

Bruce next argues that the district court erred in granting summary judgment in favor of the City on his procedural due process claim. Bruce asserts that he "was not provided notice of the zoning changes as they were being considered and enacted in the 2000–2001 time period, and in the summary judgment briefing, Appellees presented no admissible evidence to contradict his sworn statement." Aplt. Br. at 16. Bruce also challenges the hearing that preceded the demolition order, arguing that "[d]ue process requires a neutral and detached decision maker; and in these circumstances using the executive officer of the municipal body bringing the claim against [him] as the presiding judge does not meet this basic due process requirement." *Id*. at 17.

Bruce's argument that he failed to receive notice of the zoning changes to the Property fails for at least three reasons. First, the district court found that Bruce "admit[ted] that he received notice of the [2001] ordinance by no later than 2009, when Defendants mailed him a notice." Aplt. App., Vol. 4 at 24. Bruce does not dispute this finding in his opening appellate brief. Second, and relatedly, the district court concluded that "by 2009, [Bruce] had notice of the . . . Ordinance . . . and was injured by it," but "did not file this complaint until 2020." *Id*. As a result, the

28

district court concluded that "the four-year statute of limitations had long since run" when Bruce filed his complaint in 2020, and "[a]ny constitutional violations resulting from the 2001 Ordinance [we]re time-barred." *Id.* Again, Bruce does not dispute this conclusion in his opening appellate brief, and therefore, to the extent his procedural due process claim is based upon failure to receive notice of the Ordinance, it is time-barred. Third, even if the claim was not time-barred, it clearly lacks merit. That is because the Supreme Court long ago "held that constitutional procedural due process does not govern the enactment of legislation," and we in turn have held that "the adoption of a general zoning law is a legislative action."[4] *Onyx Props. LLC v. Bd. of Cnty. Comm'rs of Elbert Cnty.*, 838 F.3d 1039, 1045–46 (10th Cir. 2016).

As for Bruce's arguments regarding the propriety of the Mayor presiding over the demolition hearing, it is well established that due process requires an "impartial and disinterested" adjudicator, *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), and prohibits procedures that "might lead" "the average [person] as a judge . . . not to hold the balance nice, clear, and true between" the opposing parties, *Tumey v. State of Ohio*, 273 U.S. 510, 532 (1927). That said, we have held that "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal."

---

[4] In *Onyx*, this court "recognize[d] that not all actions by municipal boards are legislative," and that "[w]hen the action has a limited focus (only a few people or properties are affected) and is based on grounds that are individually assessed, it may be more adjudicative than legislative and therefore subject to traditional procedural requirements of notice and hearing." 838 F.3d at 1046. That exception clearly does not apply to the 2001 Ordinance in this case, because it applied generally to all R-2 zoning areas in the City.

*Corstvet v. Boger*, 757 F.2d 223, 229 (10th Cir. 1985). Further, a person claiming bias on the part of a hearing officer or tribunal "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). In applying this presumption, we have held that "[d]ue process is violated only when 'the risk of unfairness is intolerably high' under the circumstances of a particular case." *Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir. 1986) (quoting *Withrow*, 421 U.S. at 58). We have also held that "[b]ecause honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." *Id.* (citations omitted).

The Supreme Court has, over the past century, applied these same procedural due process principles to three cases, two of which Bruce cites in his opening brief, involving mayor's courts, i.e., where the mayor of a town served both in an executive capacity and a judicial capacity overseeing certain crimes and alleged ordinance violations. In *Tumey*, the mayor was authorized to try certain crimes and fine those persons whom he found guilty. 273 U.S. at 516–17. Notably, any fines that were paid partly supplemented the mayor's salary, and the remainder was deposited into the village's general fund, which the mayor had substantial control over. *Id.* at 517–19. The Supreme Court held in *Tumey* that the mayor was not an impartial adjudicator because of his personal and official interests in securing convictions and in turn imposing fines. *Id.* at 523.

A year later, in *Dugan v. Ohio*, the Court heard an appeal from a conviction "before the mayor's court of the city of Xenia, Greene county, Ohio." 277 U.S. 61, 62 (1928). The defendant was convicted by the mayor of possessing intoxicating liquor and fined $1,000. *Id*. at 63. "The defendant . . . raised the question of the constitutional impartiality of the mayor to try the case." *Id*. at 62. In addressing this question, the Supreme Court noted that "[t]he mayor ha[d] no executive, and exercise[d] only judicial, functions," and his "salary [wa]s fixed by the votes of the members of the [city] commission other than the mayor, he having no vote therein." *Id*. at 63. The Court also noted that the mayor "receive[d] no fees" from fines imposed on criminal defendants. *Id*. In addition, the Court distinguished the case from *Tumey* because "[t]he mayor of Xenia receive[d] a salary which [wa]s not dependent on whether he convict[ed] in any case or not," and even though "his salary [wa]s paid out of a fund to which fines accumulated from his court," that was "a general fund, and he receive[d] a salary in any event, whether he convict[ed] or acquit[ted]." *Id*. at 65. The Court therefore rejected the defendant's procedural due process argument.

The third and most recent case involving a mayor's court was *Ward v. Village of Monroeville*, 409 U.S. 57 (1972). Although the mayor's salary in that case did not depend on fines from convictions, the mayor did perform executive functions in addition to his judicial functions, and the revenue from fines constituted a "substantial portion of [the] municipality's funds." *Id*. at 59. The Supreme Court held that, because the mayor exercised "executive responsibilit[i]es for village

31

finances," this created an impermissible incentive for him "to maintain the high level of contribution from [his] court" to the village's general fund. *Id*. at 60. The Court therefore reversed the defendant's conviction on procedural due process grounds.

The case at hand differs substantially from all three of these Supreme Court cases involving mayor's courts. To begin with, the case at hand does not involve the Mayor acting in a judicial capacity in criminal proceedings, but rather involves the Mayor acting in an adjudicatory capacity in a demolition proceeding. Further, unlike all three of the Supreme Court cases, the Mayor in this case did not impose any fines on Bruce. Thus, there was no possibility in the instant case that ruling against Bruce in the demolition proceeding would have financially benefited the City's Mayor, either personally or professionally. To be sure, the Mayor in this case did order that the city's cost to conduct the demolition be recovered by a tax lien on the Property. But, again, there is no evidence that such a tax lien would benefit the Mayor either personally or professionally.

Although Bruce cites to *Tumey* and *Ward* in his opening appellate brief, he makes no attempt to explain how they support his procedural due process claim. Nor does he offer any explanation as to why the Mayor in this case was biased, other than to generally state that the Mayor was "the executive officer of the municipal body bringing the claim against" Bruce. Aplt. Br. at 17. That general assertion, standing alone, is insufficient to allow a reasonable jury to find that the Mayor was biased against Bruce or to otherwise find that there was a substantial risk of unfairness in the demolition proceedings due to the Mayor's role as adjudicator.

32

For these reasons, we affirm the district court's grant of summary judgment in favor of the City on Bruce's procedural due process claim.

*4) The substantive due process claim*

Finally, Bruce argues that the district court erred in granting summary judgment in favor of the City on his substantive due process claim. To understand this claim and Bruce's appellate arguments regarding it, it is useful to turn first to the allegations in Bruce's complaint. Bruce alleged in his complaint, in support of his substantive due process claim, that "Defendants . . . acted in an arbitrary and capricious manner with respect to [his] rights in the Property, including but not limited to their improper downzoning of the Property inconsistent with the historical use of the Property and factual reality on the ground, as well as . . . its inconsistent treatment of nearby properties that should have been similarly downzoned, but were not." Aplt. App., Vol. 1 at 17. Bruce further alleged that "Defendants maintain[ed] a policy, practice, custom, or procedure which prefer[red] single family units to the multi-family property maintained by [him], particularly where the owners are not local residents." *Id.* Bruce alleged that he had been "unlawfully deprived . . . of his private property" as a result of these actions, and that "[t]hese actions [we]re outrageous and of such a magnitude . . . that it truly shock[ed] the conscience." *Id.*

In his brief in opposition to defendants' motion for summary judgment, Bruce argued, in discussing his substantive due process claim, that he "was stripped of the right to rent three of the five units on his Property immediately, and it w[ould] ultimately become four of the five units once one of the tenants vacate[d]." *Id.*, Vol.

33

2 at 20. Bruce further argued that "[h]e was not provided notice of the zoning changes as they were being considered and enacted in the 2000–2001 time period, and Defendants . . . presented no admissible evidence to contradict his sworn statement." *Id*. Bruce also argued that "Defendants . . . used their administrative authority to order him to keep the units unoccupied while at the same time requiring him to maintain and upkeep the Property." *Id*. Lastly, Bruce alleged that "Defendants appointed themselves judge, jury, and executioner in the form of an administrative hearing in which [the] City's mayor decided whether or not [the] City had presented sufficient evidence to permit [the] City to order the demolition of [his] buildings, thereby furthering the city's policy and custom against multifamily housing and entitling it to a tax lien." *Id*. at 20–21.

The district court did not address most of the arguments on the merits because it concluded that any claims arising out of the enactment of the 2001 Ordinance and the 2009 Notice were time-barred. Thus, it only ruled on the merits of Bruce's arguments pertaining to the Mayor's demolition order. As to those arguments, the district court noted that (a) the City Code authorizes the City to abate dangerous buildings, (b) the City's Building Official concluded that the structure at 3166 Grant Avenue was dangerous (based on its long-term vacancy, a fire, and numerous police calls to the building over a multi-year period), and (c) after hearing from the Building Official, the Mayor "also concluded that the building was dangerous and should be demolished." Aplt. App., Vol. 4 at 36. The district court concluded that "[n]o

34

reasonable jury could find that this constitutes 'outrageous' conduct" sufficient to give rise to a substantive due process violation. *Id*.

In his opening appellate brief, Bruce repeats the same arguments he made in his brief in opposition to defendants' motion for summary judgment. Aplt. Br. at 16. In other words, he does not discuss, let alone challenge, the district court's rationale for rejecting his substantive due process challenge to the demolition order. Thus, for that reason alone, we could summarily reject Bruce's appellate arguments and affirm the district court's decision regarding his substantive due process claim. *See Nixon v. City and Cnty. of Denver*, 784 F.3d 1364, 1369 (10th Cir. 2015) (affirming district court's dismissal of due process claim because appellant's "opening brief contains nary a word to challenge the basis of the dismissal").

Out of an abundance of caution, however, we will proceed to address Bruce's challenge to the demolition order on the merits. To state a valid Fourteenth Amendment substantive due process claim challenging executive action such as the Mayor's demolition order, a plaintiff must plausibly allege that "the government action deprive[d] [the plaintiff] of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience." *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018). To be conscience shocking, a defendant's behavior must lack "any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Further, "[f]or executive action to shock the conscience requires much more than mere negligence." *Halley*, 902 F.3d at 1155. "Conduct that shocks the judicial conscience is deliberate government action

35

that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Id*. (quoting *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (internal quotation marks omitted). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Id*. (quoting *Hernandez*, 734 F.3d at 1261) (internal quotation marks omitted). "The behavior complained of must be egregious and outrageous." *Id*. (quoting *Hernandez*, 734 F.3d at 1261) (internal quotation marks omitted).

Nothing in the record in this case comes close to establishing that the City or Mayor acted egregiously or outrageously in seeking or issuing the demolition order. As the district court noted, municipalities have an important interest in controlling blight by demolishing buildings that are deemed a nuisance or threat to public health or safety. *See Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir. 1994) ("So far as we know, or have been informed, no court has held that it shocks the conscience for municipal authorities, acting pursuant to an unchallenged ordinance, to order the destruction of a building found by responsible officers to be a nuisance or threat to public health or safety."). In this case, the City's code recognizes as much because it contains an entire chapter dedicated to the abatement of dangerous buildings and structures, i.e., "buildings or structures which from any cause endanger the life, limb, health, morals, property, safety or welfare of the general public or their occupants." Ogden City Code § 16-8A-2. That chapter provides, in relevant part, that "[a]ll buildings or portions thereof which are determined after inspection by the building

36

official to be 'dangerous', as defined in Subsection B of this section, are hereby declared to be public nuisances and shall be abated by repair, rehabilitation, demolition or removal in accordance with the procedures specified herein." *Id*. § 16-8A-6(A).

It is undisputed that City officials acted pursuant to the City code when, on February 21, 2020, the City's Building Official, Steve Patrick, sent a letter to Bruce notifying him that Patrick had, for a number of stated reasons, deemed the structure located on the north side of the parcel with street address 3166 Grant a dangerous building under the City's code. In that same letter, Patrick ordered Bruce to rehabilitate or demolish the building within fifteen days. Bruce failed to do so, prompting Patrick on February 4, 2020, to petition the Mayor of the City to hold a hearing and order Bruce to show cause why the City should not abate the building. Bruce received notice of, appeared, and was represented by counsel, at the hearing before the Mayor. After the hearing, the Mayor determined that the building was in fact dangerous, as defined by the City's code, and was a public nuisance. Consequently, the Mayor ordered the building to be demolished and that a tax lien for the cost of the demolition be imposed on the Property.

Notably, Bruce does not dispute that the City code authorized these activities, and he does not dispute any of those code provisions. Nor does Bruce seriously challenge the determinations of both the City's Building Official and the Mayor that the structure at 3166 Grant was dangerous, as defined under the City's code.

In sum, Bruce offers nothing, either evidence or argument, that remotely establishes that the City's actions could be deemed to shock the conscience. We therefore affirm the district court's grant of summary judgment in favor of defendants on Bruce's substantive due process claim.

IV

The judgment of the district court is AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge